# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**MATTHEW TYLER,**

    **Petitioner,**

    **v.**                                **Case No. 16-CV-292**

**DOUG BELILLE,**

    **Respondent.**

---

### DECISION AND ORDER DENYING PETITION FOR
### WRIT OF HABEAS CORPUS

---

Matthew Tyler, who is in Wisconsin state custody pursuant to an order committing him as a sexually violent person under Wis. Stat. § 980, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. (Docket # 1.) Tyler alleges that his commitment is unconstitutional. For the reasons stated below, the petition for writ of habeas corpus will be denied and the case dismissed.

## BACKGROUND

On July 7, 2010, after a bench trial, a Milwaukee County Circuit judge entered an order committing Tyler as a sexually violent person under Wis. Stat. § 980. (Docket # 10-1.) Tyler was represented by counsel at trial. (Docket # 1 at 8.)

After Tyler's commitment, Tyler's appellate counsel filed a no-merit report pursuant to Wis. Stat. § 809.32 and *Anders v. California*, 386 U.S. 738 (1967*). In re the commitment of Matthew Tyler: State of Wisconsin v. Matthew Tyler*, 2013AP1577 (Wis. Ct. App. Sept. 16, 2015) (Docket # 1-3 at 1.) Tyler filed a response to the no-merit report, and appellate counsel filed a supplemental no-merit report. (*Id.* at 2.) In response to the Wisconsin Court

of Appeals order, Tyler's appellate counsel filed a second supplemental no-merit report and Tyler filed a second response. (*Id.*) After considering counsel's reports and Tyler's responses, and after independently reviewing the record, the court of appeals concluded that there was no arguable merit to any issue that could be raised on appeal and summarily affirmed the judgment of commitment. (*Id.*)

On October 8, 2015, Tyler filed a petition for review with the Wisconsin Supreme Court which was denied on January 7, 2016. (Docket # 1-3.) On March 10, 2016, Tyler filed his petition for a writ of habeas corpus in this court.

## STANDARD OF REVIEW

Tyler's petition is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"). Under AEDPA, a writ of habeas corpus may be granted if the state court decision on the merits of the petitioner's claim (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

A state court's decision is "contrary to . . . clearly established Federal law as established by the United States Supreme Court" if it is "substantially different from relevant [Supreme Court] precedent." *Washington v. Smith*, 219 F.3d 620, 628 (7th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). The court of appeals for this circuit recognized the narrow application of the "contrary to" clause:

> [U]nder the "contrary to" clause of § 2254(d)(1), [a court] could grant a writ of habeas corpus . . . where the state court applied a rule that contradicts the governing law as expounded in Supreme Court cases or where the state court confronts facts materially indistinguishable from a Supreme Court case and nevertheless arrives at a different result.

*Washington*, 219 F.3d at 628. The court further explained that the "unreasonable application of" clause was broader and "allows a federal habeas court to grant habeas relief whenever the state court 'unreasonably applied [a clearly established] principle to the facts of the prisoner's case.'" *Id.* (quoting *Williams*, 529 U.S. at 413).

To be unreasonable, a state court ruling must be more than simply "erroneous" and perhaps more than "clearly erroneous." *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997). Under the "unreasonableness" standard, a state court's decision will stand "if it is one of several equally plausible outcomes." *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir. 1997). In *Morgan v. Krenke*, the court explained that:

> Unreasonableness is judged by an objective standard, and under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable."

232 F.3d 562, 565–66 (7th Cir. 2000) (quoting *Williams*, 529 U.S. at 411), *cert. denied*, 532 U.S. 951 (2001). Accordingly, before a court may issue a writ of habeas corpus, it must determine that the state court decision was both incorrect and unreasonable. *Washington*, 219 F.3d at 627.

# ANALYSIS

Tyler raises four grounds for relief in his habeas petition. In Ground One, Tyler argues that his trial counsel was ineffective. In Ground Two, Tyler argues that the state court decided his ineffective of assistance of trial counsel claim without the benefit of a *Machner* evidentiary hearing. In Ground Three, Tyler argues that his postconviction counsel was ineffective. In Ground Four, Tyler argues that the state did not establish beyond a reasonable doubt that he was a sexually violent person. I will address each in turn.

*1. Ineffective Assistance of Trial and Postconviction Counsel (Grounds One and Three)*

Tyler argues that his trial and postconviction attorneys were ineffective in multiple ways. Respondent argues that Tyler is not entitled to habeas relief on these claims because he has not shown that the United States Supreme Court has clearly established that individuals subject to commitment as sexually violent persons have a federal constitutional right to counsel. (Docket # 20 at 7.) Tyler counters that the Supreme Court has found that the Sixth Amendment right to counsel is fundamental and applies to the states. (Docket # 21 at 8.)

There is no question that the Sixth Amendment right to counsel applies in all criminal prosecutions. But that is not the question presented by Tyler's habeas petition. For Tyler to prevail on these claims he must establish that he has a right under clearly established federal law to effective assistance of counsel in his civil commitment proceeding. While Tyler has a statutory right to counsel under Wis. Stat. § 980.03(2)(a) and while the Wisconsin Supreme Court in *Seibert v. Macht*, 244 Wis. 2d 378 (2001) characterized this

4

right to counsel as a constitutional right, whether Tyler has a federal constitutional right to counsel in the civil commitment proceeding is determined by the United States Supreme Court. *Locker v. Andrade*, 538 U.S. 63, 70–71 (2003).

Tyler does not cite, and I have not found, any United States Supreme Court decisions establishing a constitutional right to counsel in civil commitment cases. *See also Ambrose v. Roeckeman*, 749 F.3d 615 (7th Cir. 2014) (expressing no opinion whether a constitutional right to counsel in civil commitment proceedings exists). In two cases, the Supreme Court has considered whether constitutional rights applied in criminal proceedings also apply in civil commitment proceedings. In *Allen v. Illinois*, 478 U.S. 364 (1986), the Court considered whether Illinois civil commitment law for sexually violent offenders was "criminal" within the meaning of the Fifth Amendment's protection against compulsory self-incrimination. 478 U.S. at 365. The Court determined that it was not, reasoning that the Fifth Amendment, which provides that no person "shall be compelled in any criminal case to be a witness against himself," did not apply to proceedings which by express statutory provision were civil in nature, and which did not have the punitive features of criminal sentencing regimes. *Id.* at 368–69. The Court observed that "Illinois has expressly provided that proceedings under the Act 'shall be civil in nature,'" *id.* at 368, and that the Illinois statute's requirement that a person be detained and treated only so long as they were dangerous fundamentally distinguished its aims from the punitive and deterrent goals of the criminal law, *id.* at 369–70.

In *Kansas v. Hendricks*, 521 U.S. 346 (1997), the Court considered Kansas' civil commitment law for sexually violent offenders. The question before the Court was whether the Kansas law implicated the Constitution's ban on double jeopardy or *ex post facto* lawmaking. *Hendricks*, 521 U.S. at 360–61. The Court determined that neither was implicated because the proceedings authorized by the law were not criminal in nature. *Id.* at 360–69. The Court noted that "[t]he categorization of a particular proceeding as civil or criminal 'is first of all a question of statutory construction.'" *Id.* at 361 (quoting *Allen*, 478 U.S. at 368). As in the case of the Illinois statute, the Court further noted that the Kansas statute described itself as civil in nature and "[did] not implicate either of the two primary objectives of criminal punishment: retribution or deterrence." *Id.* at 361–62.

Although the Court did not address the right to counsel in *Allen* and *Hendricks*, in both cases, the Court declined to extend constitutional rights applied in criminal proceedings to civil commitment proceedings. What is more to the point, however, even if Tyler's counsel was ineffective, with no clearly established federal law announcing a right to counsel in civil commitment proceedings, Tyler cannot prevail on his claims of ineffective assistance of counsel. Accordingly, Tyler is not entitled to habeas relief on Grounds One and Three.

### 2. *Machner Hearing (Ground Two)*

Next, Tyler argues that he is entitled to habeas relief because the court of appeals decided his ineffective assistance claim without an evidentiary hearing pursuant to *State v. Machner*, 92 Wis. 2d 797, 285 NW 2d 905 (Wis. Ct. App. 1979). This claim fails for the

same reasons discussed above. Additionally, whether to grant a *Machner* evidentiary hearing is a matter of state law, not federal law. There is no federal constitutional right to an evidentiary hearing in state court on claim of ineffective assistance of counsel. Because habeas relief is unavailable to correct errors of state law, Tyler is not entitled to habeas relief based on Ground Two.

### 3. Sufficiency of Evidence (Ground Four)

Lastly, Tyler argues that he is entitled to habeas relief because the state did not establish beyond a reasonable doubt that he was a sexually violent person. I liberally construe this as a claim of insufficiency of evidence under the Due Process clause. The Supreme Court has recognized that "civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425 (1979). Although Wis. Stat § 980.01 requires proof beyond a reasonable doubt for a finding of civil commitment as a sexually violent person, the Supreme Court has held that due process only requires the use of the lower clear and convincing standard in civil commitment proceedings. (*Id.* at 430–32.)

The Wisconsin Court of Appeals, in reviewing whether sufficient evidence supported the trial's court finding that Tyler is a sexually violent person, cited a standard consistent with the federal standard articulated in *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) for reviewing sufficiency of evidence in criminal cases. The court of appeals stated that it may not reverse the commitment based on insufficient evidence unless the evidence, viewed most favorably to the state, is so lacking in probative value and force that no trier of fact acting

reasonably could have found that Tyler was a sexually violent person beyond a reasonable doubt. (Docket # 1-3 at 2–3.) Tyler does not argue that the court of appeals used the wrong standard. Thus, the only question to resolve on habeas review is whether the state court unreasonably applied that rule to the facts of Tyler's case or unreasonably determined the facts in light of the evidence presented.

In reviewing Tyler's sufficiency challenge, the Wisconsin Court of Appeals deferred to the trial court's assessment of credibility of the witnesses and its evaluation of the evidence. Additionally, the court of appeals found, based on its own reading of the trial transcript, that despite disagreement between the expert witnesses, there was sufficient evidence to find that Tyler is a sexually violent person. (*Id.* at 3.)

Under Wis. Stat. § 980.02(2), the state was required to prove beyond a reasonable doubt that Tyler (1) had been convicted of a sexually violent offense; (2) suffers from a mental disorder; (3) is more likely than not, because of mental disorder, to engage in at least one future act of sexual violence.

As to the first element, at trial the state showed that Tyler was convicted in 2000 of Second Degree Sexual Assault of a Child for which he was sentenced to seven years of confinement followed by thirteen years of extended supervision. (Trial Transcript, Docket #10-7 at 27.)

As to the second element, whether Tyler suffered a mental disorder, the state relied on the testimony of William Francis, a probation and parole agent who supervises Chapter 980 sex offenders, and that of Dr. Anthony Jurek, a psychologist. Francis testified that he

had reviewed Tyler's Department of Corrections file. (Docket #10-7 at 32.) He testified that the records showed that in addition to the conviction for Second Degree Sexual Assault of Child, Tyler had been convicted for Fourth Degree Sexual Assault of a Child. (*Id.* at 35.) The victim was a thirteen-year-old child whom Tyler had been coaching. (*Id.* at 36.)

Francis further testified that the records showed that Tyler had a history of alleged sexual misconduct. In 1979, while employed as a program director in a residential facility in Louisiana, Tyler was accused of sexually assaulting two boys ages 14 and 16. (*Id.* at 37.) On another occasion in 1979, he was accused of doing "hernia checks" (even though he is not a medical doctor) and strip searches on boys at the same facility. (*Id.* at 38.) Francis testified that as a result of these allegations, Tyler was terminated from the facility. (*Id.* at 39.)

Francis further testified that in 1987 Tyler was employed as a pastor at a church in Columbia, Missouri, where he was accused of sexually assaulting "several young boys over the clothing in the genital areas." (*Id.* at 39–40.) Francis also testified that Tyler was employed at the University of Missouri in the mid-1980s, and there were allegations of sexual misconduct at that university. (*Id.* at 41–42.) Later, Tyler was employed by Texas Southern University and was accused of sexually assaulting a student at a convention. (*Id.* at 42.) In the 1990s, Tyler was investigated for fondling a seven-year-old boy in the Boy Scouts at the church where Tyler was an associate pastor. (*Id.* at 42–43.) Around 1996, Tyler was employed at the University of Wisconsin-Milwaukee, and was investigated for sexually assaulting a student at that university. (*Id.* at 43.) Finally, Francis testified that while in

prison Tyler was adjudicated for sexually assaulting three inmates in 2001, 2002, and 2004, respectively. (*Id.* at 46, 52, 53, 61).

Next, the state relied on the testimony of Dr. Jurek, a psychologist employed by the Wisconsin Department of Correction who conducts evaluations of sexual offenders. (Docket # 10-8 at 25.) Regarding mental disorder, Dr. Jurek testified that he diagnosed Tyler as having paraphilia, not otherwise specified. Dr. Jurek testified that the DSM defines paraphilia as "recurrent, intense sexually-arousing fantasies, urges, or behaviors that generally involve nonhuman objects, the suffering or humiliation of one's self or one's partner, children or non-consenting persons." (*Id.* at 54.) Dr. Jurek further testified that the diagnosis also requires that the difficulties go on over a period of at least six months; and that there be some negative consequences for the individual, either emotional consequence or real-life consequences in terms of problematic relationships, arrests, or job loss. (*Id.* at 55.) Dr. Jurek testified that "not otherwise specified" means that the person meets the criteria in a general way. (*Id.* at 56–57.)

Dr. Jurek opined that Tyler met the paraphilia not otherwise specified diagnoses for the following reasons: Tyler has a history of similar allegations of sexual misconduct. (*Id.* at 61.) Tyler has had 17 victims. (*Id.* at 59.) Other than in prison, Tyler has shown a pattern of making sexual contact with young males in the late teens, early 20s, and as young as seven. (*Id.* at 62.) Tyler has a pattern of "involving himself sexually with other people without first getting permission either because they are not conscious, as is the case in the Department Corrections behaviors, because they are not aware of what his intentions are, or because

10

they are below the age at which an individual can consent to sexual behavior." (*Id.* at 59–60.) Tyler's conduct has resulted in significant consequences including termination from employment and criminal sanctions. Dr. Jurek testified that Tyler "repeatedly engages in behavior that has negative consequences for him, yet he continues to return to that same behavior over and over again; suggesting to me that he does not have control over his behavior and acts against his own best interests." (*Id.* at 63.) As an example of Tyler's lack of control, Dr. Jurek testified that in one incident where Tyler's cellmate woke up to Tyler sexually assaulting him, Tyler apologized and said that he couldn't control himself. (*Id.* at 64.)

As to the third factor, whether the mental disorder makes it likely that Tyler would engage in acts of sexual violence in the future, the state also relied on the testimony of Dr. Jurek. Dr. Jurek testified that to determine future risk posed by Tyler, he used three actuarial measurements: the Rapid Risk Assessment of Sexual Offender Recidivism (RRASOR), the Static-99, and the Minnesota Sex Offender Screening Test Revised (MnSOST-R). (Docket #10-9 at 19.) These actuarial measures help determine a basic level at which reoffense occurs for individuals similar to Tyler. (*Id.*)

Dr. Jurek testified that the RRASOR was developed based upon research finding that certain demographic features of an individual predicted whether or not they would reoffend. (*Id.* at 20.) It relies on documented convictions and makes predictions five and ten years out. (*Id.* at 21.) Dr. Jurek testified that this instrument may potentially underestimate an individual's risk of reoffending because of underreporting of sexual offenses and because it

does not assess lifetime risk. (*Id.* at 22.) Tyler's score on this instrument was four. (*Id.* at 24). For individuals with a score of four, the reoffense rate over a period of five years was found to be 32.7% and over a period of ten years was 48.6%.

Dr. Jurek testified that there have been recent attempts in the literature to account for the short periods of five and ten years as opposed to a lifetime, and to account for underreporting. (*Id.* at 25.) Dr. Jurek testified that under one such extrapolation method by a Dr. Doren, Tyler's score of four under the RRASOR, yielding a 32.7% reoffense rate for a five-year period, would be double to yield an approximately 64% reoffense rate for a lifetime. (*Id.* at 30.) Dr. Jurek acknowledged that the extrapolation methods were new and that there were debates about their use. (Docket # 24-1 at 15.)

Dr. Jurek testified that as to the Static-99, Tyler scored five which represents a five-year rate of reoffense of 33%, a ten-year rate of reoffense of 39%, and a fifteen-year rate of 40%. (*Id.* at 36.) Dr. Jurek testified under the Static-99R Tyler's score would go down to four because the Static-99R deducts one point for being over forty years old. (*Id.* at 38.) A score of four is associated with a five-year rate of 20% and a ten-year rate of 29%. (*Id.* at 38–39.) Dr. Jurek testified that using Dr. Doren's extrapolation model on Tyler's score on the Static-99 would double his rate of reoffense to 66%. (*Id.* at 38.)

In regard to the MnSOST-R, Dr. Tyler testified that this instrument includes both dynamic factors and static factors. However, it is normed on a much smaller population. (*Id.* at 39.) Tyler scored two on a scale that goes up to sixteen points. That score is associated with a 12% rate of recidivism over six years. (*Id.* at 41.)

12

Dr. Jurek further testified that the actuarial scores underestimate Tyler's risk of reoffending. (*Id.* at 43, 49.) Dr. Jurek testified that the actuarial scores only accounted for Tyler's two convictions, not his extensive history of sexual offending. (*Id.* at 44.) On that point, Dr. Jurek testified that his "biggest concern is that there is a large number of victims over an extended period of time that essentially are invisible to the actuarial measures." (Docket # 10-12 at 64.) Dr. Jurek also testified that the other issue he had with applying the actuarials in Tyler's case is Tyler's advanced education. (*Id.* at 65.) He explained that Tyler's Ph.D. makes him very different from the average person in the studies on which the instruments are construed. (*Id.*)

Dr. Jurek testified that in evaluating an individual's risk of reoffending, he considers mitigating factors, such as treatment. (Docket # 10-9 at 49.) However, Tyler has not successfully completed sex offender treatment. Additionally, Tyler has categorically denied any of the sexual offenses including his convictions. (*Id.* at 50.) Further, Dr. Jurek testified that Tyler has not shown that he falls within the group of offenders whose conduct slows down with age. (*Id.* at 60–61.) Dr. Jurek testified that he does not weigh the fact that Tyler has not had any conduct reports in six and a half years as "remittance" from paraphilia. (Docket # 10-12 at 98–99.) Dr. Jurek opined that not reoffending in that time period could be a function of Tyler being in a controlled environment and not having access to his preferred victims, adolescent boys. (*Id.* at 99–100.)

Dr. Jurek testified that he believes that Tyler represents a risk of engaging in future acts of sexual violence that is greater than 50%. (Docket #10-9 at 49.) Dr. Jurek testified to a

reasonable degree of psychological and professional certainty that Tyler's diagnosis of paraphilia predisposes Tyler to engage in future acts of sexual violence. (*Id.* at 61.)

Tyler submitted evidence from three expert witnesses: Dr. Sheila Fields, Dr. Charles Lodl, and Dr. Diane Lytton. Dr. Fields, who holds a doctorate degree in sexology, testified that in addition to having a private practice she works for the Department of Health Services doing Chapter 980 evaluations. (Docket #24-1 at 48–49.) Dr. Fields testified that as part of her evaluation of Tyler she reviewed his entire file. (*Id.* at 51.) He declined to interview with her but that did not preclude her from reaching a conclusion. (*Id.*) Dr. Fields testified that she diagnosed Tyler with paraphilia not otherwise specified. (*Id.* at 52.) Dr. Fields testified that she made the diagnosis based on Tyler's two convictions, and allegations dating back to 1979 including six different incidents with numerous victims ranging from the age of seven to a young adult. (*Id.* at 53.) Dr. Fields testified that Tyler suffers from a problematic sexual drive that he finds difficult to keep in check and that paraphilia causes Tyler to be less able to control himself. (*Id.* at 96–97.)

Relevant to the risk of reoffending, Dr. Fields testified that she submitted two reports as to Tyler: an initial report in 2008 and an updated report in 2009. In her initial report she scored Tyler at five on the Static-99 which meant that he was in the "pre-selected high-risk group and his risk of reconviction" was 30% at ten years. (*Id.* at 56–57.) She concluded in that report that she could not say to a degree of psychological certainty whether Tyler was more likely than not to commit further acts of sexual violence. (*Id.* at 65.) She felt that she did not have enough evidence that Tyler met the more likely than not standard. (*Id.*)

Dr. Fields testified that in her updated report she reevaluated Tyler using the Static-99R. (*Id.* at 66.) She testified that she used the Static-99R because the people who developed the test felt it is now the most "state-of-the-art" instrument. (*Id.*) Using the Static-99R reduced Tyler's score to a four due to his age. (*Id.* at 67.) Dr. Fields testified that a score of four placed Tyler at a reoffense risk of 30% for period of ten years. (*Id.* at 68.) She further testified, however, accounting for the need to look at lifetime risk and that there are sexual offenses that aren't necessarily caught or arrested, she placed him in a risk category "up to around 45 percent." (*Id.*) Dr. Fields further testified that using Dr. Doren's or Dr. Thornton's extrapolation method places Tyler in the "mid forties' percentage for risk of reoffending." (*Id.* at 71.) She testified even taking account Tyler's uncharged allegations, she felt that the "mid-forties" was an accurate percentage.

Dr. Fields testified that based on the Static-99R, she concluded to a degree of psychological certainty that Tyler is not more likely than not to commit future sexually violent acts. (*Id.* at 76.) Dr. Fields testified that the fact that Tyler has not participated in treatment did not change her conclusion. However, she acknowledged that treatment could further mitigate risk. (*Id.* at 77.) Dr. Fields opined that Tyler's statement that he couldn't help himself when caught sexually assaulting the sleeping inmate is "very important." (*Id.* at 83.) However, she testified that she would only be speculating whether Tyler was asking for forgiveness or expressing that he had a compulsion. (*Id.*) She later conceded that it is a "possibility" that the statement pertained to Tyler's ability to control his sexual urges. (*Id.* at 112.)

Dr. Charles Lodl, a psychologist specializing in the evaluation and treatment of sex offenders, testified that he interviewed Tyler and reviewed his records. (Docket # 10-10 at 11–12.) With regard to mental disorder, Dr. Lodl testified that he diagnosed Tyler with paraphilia not otherwise specified and narcissistic personality disorder. (*Id.* at 33.) Dr. Lodl testified that he made the paraphilia diagnosis based on the behavior associated with Tyler's two convictions and based on the allegations against Tyler dating back to 1979. (*Id.* at 34.) Dr. Lodl further testified that although he recognized some of the past incidents were mere allegations, he couldn't ignore the similarities between them. (*Id.*) Dr. Lodl opined that he does not think that the paraphilia diagnosis means that a person has difficulty controlling their behavior. (*Id.* at 37–39.) Specifically, as to Tyler, he testified that he does not believe that Tyler is unable to exert volitional control. (*Id.* at 40.)

Regarding actuarial instruments used to assess risk, Dr. Lodl testified that he did not use the RRASOR because it is an outdated instrument which overestimate risk. (*Id.* at 49.) He also did not use the MnSOST because he does not believe it has stood up well in cross-validation studies. (*Id.* at 49–50). Dr. Lodl testified that he used the Millon Clinical Multiaxial Sex inventory which depends upon answers provided by the subject. (Docket 10-11 at 5–6.) Dr. Lodl testified that Tyler scored a four on the Static-99 which is associated with a risk over a five-year period between 7.7 and 19.1%, and 8.2 to 27.3% over a ten-year period. (Docket # 10-10 at 41.) Dr. Lodl did not use extrapolation methods. (*Id.* at 45–46.) He opined that those methods should not be used at this time because they are "unproven." (*Id.*)

Dr. Lodl testified that Tyler's advanced education might be a "protective factor," in that it might reduce his risk to offend, given that his greater cognitive skills make him able to use personal resources to refrain from reoffending. (*Id.* at 54.) Dr. Lodl testified that to a reasonable degree of psychological certainty Tyler does not meet the required criteria of more likely than not to sexually reoffend. (*Id.* at 55.)

Unlike the other experts, Dr. Lytton, also a psychologist, testified that she did not find that Tyler met the diagnostic criteria for any mental disorder. (Docket # 10-11 at 30–31.) She opined that although Tyler engaged in illegal behavior she did not find that there was any evidence that he engaged in sexually deviant behavior. (*Id.*) She further testified that although "a subset of people who engage in non-consenting sex with teens and adults, a subset of them certainly can be diagnosed with some mental disorder, but most do not. Most cannot be diagnosed like that so I did not diagnose that." (*Id.* at 31.) She testified that in her opinion Tyler did not meet the diagnosis criteria for paraphilia. (*Id.* at 32.)

Dr. Lytton further testified that because Tyler does not have a mental disorder, there is no risk to reoffend. (*Id.* at 36.) However, because she was asked to, she did evaluate his hypothetical risk to reoffend. (*Id.*) She testified that to assess Tyler's risk to reoffend she used the Static-99R. (*Id.* at 36–37). She testified that she did not use the RRASOR because it is redundant of the Static-99. (*Id.* at 38.) Using the Static-99R, Dr. Lytton scored Tyler at a three which would put him at 6% rate for reoffending over a five-year period. (*Id.* at 40.) She testified that, alternatively, looking at another sample group places Tyler in the category of "ten percent over five years and a range of about seven to thirteen percent." (*Id.* at 41.) Dr.

Lytton further testified that the five-year rates are the most accurate to assess Tyler. (*Id.* at 44.) She testified that given his age, fifty-four, his reoffending rates will continue to go down. (*Id.* at 44.) Dr. Lytton did not use the extrapolation methods, finding them not empirically supported at this time. (*Id.* at 48–49.) She testified that Tyler is not more likely than not to reoffend. (*Id.*)

On this record the court of appeals' decision that there was sufficient evidence for the trial court's finding that state had met its burden on each of the elements of Wis. Stat. § 980 was not unreasonable. Tyler contests the sufficiency of the evidence as to the second element, whether he suffers a mental disorder, and the third element, whether the metal disorder makes it more likely than not that he would reoffend. To the extent that Tyler argues that the evidence was insufficient because of the disputes between the experts, his argument fails. The trial judge as the trier of fact was entitled to weigh the evidence and choose to accept a witness' testimony in whole, in part, or not at all. On the issue of whether Tyler suffered from mental disorder, only Dr. Lytton found that Tyler did not fit a mental disorder diagnosis. The trial judge found Dr. Lytton's testimony not credible and discounted it. (Docket # 10-13 at 6.) Though there were some differences in the details of the other experts' diagnoses, there was sufficient evidence in the record that Tyler suffered from a mental disorder, specifically paraphilia not otherwise specified.

Similarly, the trial judge had sufficient evidence to find that it is more likely than not that because of mental disorder, Tyler would engage in at least one future act of sexual violence. Again, the trial judge as the trier of fact could decide what weight to give the

evidence. In this case, the judge reasoned that the "actuarials may be tools to work with but they are not the end all of end alls." (*Id.* at 6.) Rather, the trial judge credited Dr. Jurek's testimony that clinical judgment must weigh in the analysis of whether Tyler is more likely than not to commit acts of sexual violence in the future. (*Id.* at 9.) The trial judge reasoned that in Tyler's case the actuarial scores did not tell the whole story; rather, his past behavior was a better indicator, and it suggested that he is more likely than not to reoffend in the future. (*Id.* at 14.)

Tyler argues that the trial court found him to be a sexually violent person "without properly considering the required nexus between dangerousness and mental disorder." (Docket # 18 at 31.) This argument ignores both Dr. Jurek's and Dr. Fields' testimony connecting Tyler's mental illness and his inability to control his behavior. Dr. Jurek testified that Tyler's long history of repeated sexual misconduct, despite experiencing negative consequences such as loss of jobs and criminal sanctions, indicated lack of control. As further evidence of Tyler's inability to control himself, Dr. Jurek cited to Tyler's sexual assault on a sleeping inmate in which Tyler apologized to the inmate saying words to the effect that he could not control himself. Dr. Jurek testified that to a reasonable degree of psychological and professional certainty, Tyler's diagnosis of paraphilia predisposes Tyler to engage in future acts of violence. Even Dr. Fields, who testified that Tyler did not meet the Chapter 980 criteria, testified that Tyler suffers from a problematic sexual drive that he finds difficult to keep in check and that paraphilia causes Tyler to be less able to control himself. On this record, the trial judge had sufficient evidence to consider the nexus between Tyler's

mental disorder, his ability to control himself because of that disorder, and hence, his future dangerousness.

Tyler also faults the trial judge for crediting Dr. Jurek's testimony that Tyler was dangerous due to a mental disorder over the testimony of the other three experts that he was not dangerous due to mental disorder. (Docket # 18 at 33.) It bears repeating that the trier of fact can choose which witnesses to believe or credit. Thus, it is never a question of which side has the most witnesses. The trial judge was well within his right to credit Dr. Jurek's testimony in light of the totality of the evidence presented to him despite the fact that Tyler presented more expert witnesses.

Because Tyler has not shown that the court of appeals' decision on his sufficiency of the evidence challenge was contrary to or an unreasonable application of federal law, Tyler is also not entitled to habeas relief on this ground.

## CERTIFICATE OF APPEALABILITY

According to Rule 11(a) of the Rules Governing § 2254 Cases, the court must issue or deny a certificate of appealability "when it enters a final order adverse to the applicant." A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make a substantial showing of the denial of a constitutional right, the petitioner must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate

to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 and n.4).

Reasonable jurists could not debate that Tyler fails to make a substantial showing of the denial of a constitutional right. Thus, I will deny him a certificate of appealability. Of course, Tyler retains the right to seek a certificate of appealability from the court of appeals pursuant to Rule 22(b) of the Federal Rules of Appellate Procedure.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the petitioner's petition for a writ of habeas corpus (Docket # 31) be and hereby is **DENIED**.

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**.

**IT IS ALSO ORDERED** that a certificate of appealability shall not issue.

**FINALLY, IT IS ORDERED** that the Clerk of Court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 10th day of December, 2018.

BY THE COURT:

*s/Nancy Joseph*
NANCY JOSEPH
United States Magistrate Judge